J-S84043-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOSEPH EUGENE MCCLOSKEY | : | |
| | : | |
| Appellant | : | No. 1110 MDA 2017 |

Appeal from the PCRA Order June 19, 2017
In the Court of Common Pleas of Lycoming County
Criminal Division at No(s): CP-41-CR-0000627-2005

BEFORE: SHOGAN, J., LAZARUS, J., and OTT, J.

MEMORANDUM BY OTT, J.: **FILED MAY 09, 2018**

Joseph Eugene McCloskey appeals from the order entered June 19, 2017, in the Lycoming County Court of Common Pleas, dismissing his first petition for collateral relief filed pursuant to the Post Conviction Relief Act ("PCRA").[1] McCloskey seeks relief from the judgment of sentence of life imprisonment imposed on August 15, 2006, after a jury convicted him of first-degree murder[2] for the March 2005 shooting death of his paramour, Christine Montgomery. On appeal, McCloskey contends trial counsel rendered ineffective assistance when he interfered with McCloskey's right to testify at trial, resulting in McCloskey's involuntary and unknowing waiver of that right. For the reasons below, we affirm.

---

[1] 42 Pa.C.S. §§ 9451-9546.

[2] **See** 18 Pa.C.S. § 2502(a).

The facts underlying McCloskey's conviction were summarized by a panel of this Court in the memorandum decision affirming his judgment of sentence of direct appeal:

[S]hortly after 4:00 p.m., on March 23, 2005, [McCloskey] shot and killed the victim, his girlfriend, Christine Montgomery, out in front of the victim's home. [McCloskey's] friend, Jeffrey English, witnessed the shooting. Mr. English testified at trial that [McCloskey] had called him sometime before 4:00 p.m. on March 23, 2005, and asked him to "come up and get the guns out of the house before he shot [the victim]." Sensing the seriousness of [McCloskey's] request, Mr. English drove to the victim's house. A short time after arriving, Mr. English proceeded to the front door of the victim's residence and was greeted by [McCloskey] before he (Mr. English) ever made his way to the front door. [McCloseky] approached Mr. English carrying two firearms, one of which, the shotgun, he handed to Mr. English. While Mr. English was checking the shotgun to determine if it was loaded, the victim exited the residence, told Mr. English to "take care of him [meaning McCloskey]," and proceeded to the driveway. Before reaching the driveway, the victim said something to [McCloskey] which Mr. English could not make out, and then [McCloskey] "took the gun down, cocked it, said 'I have fucking bullets in it[,'] and brought it up, pointed it, and shot[.]" Mr. English further testified that he grabbed the firearm from [McCloskey] and would have immediately left the property but for [McCloskey,] who followed Mr. English and asked for the firearm so that he could shoot himself; Mr. English refused and then left the property. After pulling out of the driveway, Mr. English testified that, in his rearview mirror, he saw [McCloskey] dragging the victim's body back on the driveway towards the garage. Mr. English proceeded directly to the Old Lycoming Police Department, where he related the aforementioned events to Chief R. Mark Lusk and Corporal William C. Solomon. Almost immediately, Chief Lusk and Mr. English returned to the victim's residence where it was determined that [McCloskey] had fled the scene on foot. At that time, police began a search for [McCloskey], and at 9:00 p.m., after two local residents notified officers that they had seen tracks in the snow, Agent Stephen J. Sorage of the Willamsport Bureau of Police

> apprehended [McCloskey] in a trailer less than one mile away from the scene of the crime.

***Commonwealth v. McCloskey***, 954 A.2d 39 [2216 MDA 2006] (Pa. Super. 2006) (unpublished memorandum at 4) (citation omitted).

McCloskey was charged with criminal homicide and persons not to possess firearms.[3]  He proceeded to a jury trial on the homicide charge, and, on May 18, 2006, the jury returned a verdict of guilty on the charge of first-degree murder.[4]  On August 15, 2006, McCloskey entered a guilty plea to the firearms offense.  That same day, the trial court sentenced him to a mandatory term of life imprisonment for his conviction of first-degree murder, and a concurrent term of two to four years' imprisonment for the firearms conviction.  McCloskey filed a timely post-sentence motion challenging the weight and sufficiency of the evidence, the court's jury instructions, and various evidentiary and pre-trial rulings.  The trial court denied the motion in December of 2006.  As noted above, McCloskey's judgment of sentence was affirmed by this Court on direct appeal, and the Pennsylvania Supreme Court subsequently denied his petition for allowance of appeal.  ***See*** ***Commonwealth v. McCloskey***, 964 A.2d 1 (Pa. 2009).

---

[3] ***See*** 18 Pa.C.S. §§ 2501 and 6105(a)(1), respectively.

[4] The jury was instructed on the offenses of first-degree murder, third-degree murder, and involuntary manslaughter.  ***See*** N.T., 5/15/2006, 5/17/2006, and 5/18/2006, at 312-317.

- 3 -

On February 19, 2010, McCloskey filed a timely, *pro se* PCRA petition, followed shortly thereafter by two amendments. Although PCRA counsel was appointed on June 21, 2010, counsel took no action on McCloskey's behalf. The case sat dormant for almost six years until McCloskey filed another *pro se* amended petition on February 29, 2016.[5] New counsel was appointed in March of 2016, and filed an amended petition on August 4, 2016, asserting trial counsel's ineffectiveness for interfering with McCloskey's right to testify on his own behalf, thereby resulting in an unknowing and involuntary waiver of that right. The PCRA court conducted evidentiary hearings on January 10, 2017, and February 24, 2017. Thereafter, on June 19, 2017, the court denied McCloskey relief. This timely appeal followed.[6]

Our review of an order denying PCRA relief is well-settled:

> This Court reviews a PCRA court's decision in the light most favorable to the prevailing party. **Commonwealth v. Hanible**, 612 Pa. 183, 30 A.3d 426, 438 (2011). Our review is limited to a determination of whether the record supports the PCRA court's factual findings and whether its legal conclusions are free from error. **Id.** "A PCRA court's credibility findings are to be accorded great deference, and where supported by the record, such determinations are binding on a reviewing court." **Commonwealth v. Treiber**, ___ Pa. ___, 121 A.3d 435, 444

---

[5] The record provides no explanation for the delay.

[6] On June 23, 2017, the PCRA court ordered McCloskey to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). McCloskey complied with the court's directive, and filed a concise statement on July 5, 2017.

- 4 -

(2015) (citing **Commonwealth v. Dennis**, 609 Pa. 442, 17 A.3d 297, 301 (2011)). We review the PCRA court's legal conclusions de novo. **Commonwealth v. Roney**, 622 Pa. 1, 79 A.3d 595, 603 (2013).

**Commonwealth v. Williams**, 141 A.3d 440, 452 (Pa. 2016). Furthermore, where, as here, the defendant alleges counsel rendered ineffective assistance, we note:

> "In order to obtain relief under the PCRA premised upon a claim that counsel was ineffective, a petitioner must establish beyond a preponderance of the evidence that counsel's ineffectiveness 'so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.'" **Commonwealth v. Payne**, 794 A.2d 902, 905 (Pa. Super. 2002), *quoting* 42 Pa.C.S.A. § 9543(a)(2)(ii). When considering such a claim, courts presume that counsel was effective, and place upon the appellant the burden of proving otherwise. **Id.** at 906. "Counsel cannot be found ineffective for failure to assert a baseless claim." **Id.**

> To succeed on a claim that counsel was ineffective, Appellant must demonstrate that: (1) the claim is of arguable merit; (2) counsel had no reasonable strategic basis for his or her action or inaction; and (3) counsel's ineffectiveness prejudiced him. **Commonwealth v. Allen**, 833 A.2d 800, 802 (Pa. Super. 2003).

**Commonwealth v. Michaud**, 70 A.3d 862, 867 (Pa. Super. 2013). "To demonstrate prejudice, a petitioner must show that there is a reasonable probability that, but for counsel's actions or inactions, the result of the proceeding would have been different." **Commonwealth v. Mason**, 130 A.3d 601, 618 (Pa. 2015).

In the present case, McCloskey asserts trial counsel rendered ineffective assistance by interfering with his right to testify in his own defense.

Preliminarily, we acknowledge "[t]he right of an accused to testify on his own behalf is a fundamental tenet of American jurisprudence and is explicitly guaranteed by Article I, Section 9 of the Pennsylvania Constitution." **Commonwealth v. Nieves**, 746 A.2d 1102, 1105 (Pa. 2000). Accordingly,

> [t]he decision of whether or not to testify on one's own behalf is ultimately to be made by the defendant after full consultation with counsel. **Commonwealth v. Uderra**, 550 Pa. 389, 706 A.2d 334 (1998); **Commonwealth v. Bazabe**, 404 Pa.Super. 408, 590 A.2d 1298, *alloc. denied*, 528 Pa. 635, 598 A.2d 992 (1991); **Commonwealth v. Fowler**, 362 Pa.Super. 81, 523 A.2d 784, *alloc. denied*, 517 Pa. 598, 535 A.2d 1056 (1987). In order to sustain a claim that counsel was ineffective for failing to advise the appellant of his rights in this regard, the appellant must demonstrate either that counsel interfered with his right to testify, or that counsel gave specific advice so unreasonable as to vitiate a knowing and intelligent decision to testify on his own behalf. **Id.**

**Id.** at 1104. **See also Michaud**, **supra**. Furthermore, this Court has recognized that "a defendant who made a knowing, voluntary, intelligent waiver of testimony may not later claim ineffective assistance of counsel for failure to testify." **Commonwealth v. Lawson**, 762 A.2d 753 (Pa. Super. 2000), *appeal denied*, 781 A.2d 141 (Pa. 2001).

Here, McCloskey insists he wanted to testify in his own defense, and repeatedly informed his attorneys[7] of this numerous times both before and during trial. **See** McCloskey's Brief at 13-14. Nevertheless, he claims counsel

---

[7] At trial, McCloskey was represented by two attorneys from the Lycoming County Public Defender's Office, lead counsel William Miele ("Attorney Miele"), and co-counsel Nicole Spring ("Attorney Spring").

did not want him to testify and employed his siblings to help convince him not to do so. *See id.* at 22-25.

McCloskey's claim is based upon the following factual allegations developed during the PCRA hearing. McCloskey contends that on the third day of trial, he met with Attorney Miele in his holding cell to discuss whether or not he was going to testify. *See* N.T., 1/10/2017, at 109. Attorney Miele arranged for McCloskey's sister, Karen Neylon, to be there to help convince McCloskey not to testify. *See id.* at 109-110. McCloskey claims that when he told Attorney Miele he wanted to testify, counsel "reacted physically and verbally in a manner which took away [McCloskey's] right to make a voluntary, knowing and intelligent decision based in part on the reasonable advice of counsel on whether or not to testify in his own defense." McCloskey's Brief at 14. Specifically, McCloskey asserted Attorney Miele "became heated and engraged," threw papers at him, kicked a register, and called him "pig headed," "bullheaded," and a "fucking idiot." N.T., 1/10/2017, at 110-111. Ms. Neylon corroborated McCloskey's account of the incident. *See* id. at 12-13.

Based upon Attorney Miele's behavior, McCloskey contends he was "confused and felt betrayed." McCloskey's Brief at 15. Therefore, he told Attorney Miele he "would like more time to decide to take the stand," and asked counsel to request the trial court allow him to make the decision the next morning. N.T., 1/10/2017, at 111. McCloskey testified counsel never

told him the decision of whether or not to testify was his and his alone. ***See id.*** at 112.

The trial transcript reveals that Attorney Miele did, in fact, inform the trial court that McCloskey wanted a continuance until the next morning to decide whether or not to testify, although counsel stated to the court, "I told him I didn't think the Court would probably do that[.]" ***See*** N.T., 5/15/2006, 5/17/2006, and 5/18/2006, at 263-264. The trial court denied the request, and Attorney Miele asked if McCloskey's colloquy could be held in chambers, which the court allowed. ***See id.*** at 264-265. Thereafter, the following colloquy took place:

> [The Court:] Sir, you are the Defendant in this case, Joseph McCloskey?
>
> [McCloskey:] Yes, ma'am.
>
> [The Court:] And, Mr. Miele has indicated to me at the break that you – that the Defense was going to rest, which ultimately means you would not be testifying in this case, is that correct?
>
> [McCloskey:] That's correct.
>
> [The Court:] Now, you understand as part of the reason why we're in here is I have a responsibility to on the record ask you questions about [] the decision [] whether or not to testify in a trial, you understand that?
>
> [McCloskye:] Yes, ma'am.
>
> [The Court:] And you understand that if you need it, it seems like you've had plenty of time to talk to Mr. Miele, we gave a break if Mr. Miele or Miss Spring needed more time to speak with you about this that you've had the opportunity today to explore those issues with Mr. Miele, is that correct?

[McCloskey:]     Yes.

[The Court:]     And whose – and was it your decision not to testify?

[McCloskey:]     Pretty much all of ours.

[The Court:]     All of ours meaning your defense team, the people that have been sitting in court with you?

[McCloskey:]     Yeah.

[The Court:]     In terms of Mr. Miele and Miss Spring and perhaps even Ms. Holmes [their paralegal] to a certain degree?

[McCloskey:]     Correct.

[The Court:]     Okay.  Is that something you want to do meaning not testify?

[McCloskey:]     Yes, ma'am.

[The Court:]     Okay.  Now you understand you have an absolute right to remain silent.  You also have a right to testify in this criminal trial?

[McCloskey:]     Yes, ma'am.

[The Court:]     And knowing that you have chosen to remain silent?

[McCloskey:]     Yes, ma'am.

[The Court:]     Now, under the---let me just go on this issue first.  Mr. Miele, were there any questions you wanted to follow up with on this issue?  I'm going to talk about the other thing in just a second.

…

[Attorney Miele:]     Just point out to the Court that we did advise him it was our opinion not to testify and I think it was unanimous as a [d]efense team and we also discussed it with family members who had an opportunity to discuss it themselves with Mr. McCloskey and they informed him and all of that had an impact or influenced his decision.

[The Court:]     That's correct, Mr. McCloskey?

[McCloskey:]     Yes, ma'am.

*Id.* at 267-269.

The court then discussed whether or not McCloskey wanted a jury instruction regarding his decision not to testify,[8] before the following exchange occurred:

[The Court:]     … I should also probably put on the record that a request was made on your behalf by your attorney, Mr. Miele, to allow us to stop for today and allow you to have over night (sic) to make the decision as to whether or not you should proceed with testifying.  I denied that request and my concern is just from purely a time constraint in that with the nature of the trial, the fact that you've been a part of the proceedings and have had the opportunity to speak with your defense team all throughout this trial as well as all throughout the course of preparing for the trial. So that I did not see any benefit to be served by allowing you the additional time so I denied that request, but I wanted to tell you that face to face that it wasn't entertained by the Court, but I denied it.

[McCloskey:]     Can I say something?

[The Court:]     You're under oath.

[McCloskey:]     It's just that I didn't have all the evidence.  I mean – I mean I wasn't getting stuff all the way up until the end, you know what I mean, I didn't have as much time to review as long as I would have liked to just, you know that.

[The Court:]     My understanding you were probably, through your attorneys, [] handed an enormous amount of information much of which was not presented through the trial.  You were present in the courtroom though the entire case so that if Mr. Miele and Miss Spring would have talked about whether or not you should testify I imagine it's not based upon the voluminous reports it's based upon purely what was discussed in the courtroom and

---

[8] **See** N.T., 5/15/2006, 5/17/2006, and 5/18/2006, at 269-271.

- 10 -

their perception of the strength of the – relative strength of your case whether you testify or if you don't testify.

[McCloskey:]     Well, the thing – my thing is like with [my firearms expert] Kapelsohn[9] and that certain points weren't allowed to be put in I didn't know what would be, you know, what I mean until today actually, you know.

[The Court:]     Right.

[McCloskey:]     You know, I don't know, just –

[The Court:]     I agree with you there because we weren't sure. I didn't know about Sergeant Wolfgang until yesterday and then as a result it changed the rulings that I had previously made with regard to Mr. Kapelsohn's report absolutely, but in the grand scheme of the trial again it's my valued judgment and it's always subject to review, but based upon that short time that Mr. Kapelsohn was on the stand I don't believe that justifies a continuance until tomorrow to decide whether or not you should testify or not, okay, but you've expressed your opinion on the record or your concerns on the record and your record is protected. Okay. But you have had—but you've had enough time to speak with your attorneys all along because I had always gotten an impression that your attorney visited over at the county prison even when we were in trial, right, didn't they visit you Tuesday when we didn't have court in the morning? My understanding they came over and visited you.

[McCloskey:]  Yes, ma'am.

[The Court:]   There's been quite an open dialog with your attorneys more so than maybe in some cases I think you've – they've gone above and beyond to make sure that you were aware of everything. I can only tell what I [have] seen out front. Was there anything else or any other concern that you wanted to express to me?

_____

[9] Emanuel Kapelsohn and Pennsylvania State Police Sergeant Eric Wolfgang were the parties' firearms experts. After Sergeant Wolfgang testified for the Commonwealth, the trial court modified a prior ruling it made restricting the testimony of McCloskey's expert, Kapelsohn. ***See id.*** at 178-189.

[McCloskey:]    No, ma'am.

*Id.* at 271-273.

With this factual background in mind, we consider McCloskey's argument on appeal. He maintains that counsel – in particular, Attorney Miele – interfered with his right to testify in his own defense. McCloskey insists counsel's berating of him when he expressed his desire to testify "took away" his ability to make a voluntary and informed decision. *See* McCloskey's Brief at 14. He contends the transcript supports his claim, arguing:

> At this point, the trial court is presented with a defendant who has asked for more time to decide whether or not to testify before the colloquy, who during the colloquy repeatedly references the decision being everyone's, not specifically his, who is never told during the colloquy that the decision is his and his alone and who immediately following the colloquy expresses concerns about being confused and needing more time. Even in isolation these facts would suggest [McCloskey's] decision may not be knowing, intelligent and voluntary. When trial counsel's ineffective assistance in directly interfering with [his] right to testify in the holding cell is factored in, the conclusion is simple. [McCloskey] was denied his right to make a knowing, intelligent and voluntary decision on whether or not to testify on his own behalf.

McCloskey's Brief at 19. Moreover, he points to the PCRA hearing testimony of both his sister and brother, who corroborated his account of Attorney Miele's combative manner, as well as counsel's own testimony, in which Attorney

Miele claimed he had no independent recollection of the meeting in McCloskey's holding cell.[10] *See id.* at 22-27.

McCloskey further insists counsel's ineffectiveness prejudiced him because he was the only other witness to the shooting besides English, and the only person who "could explain an alternate theory and articulate his defense to the jury."  McCloskey's Brief at 20.  Indeed, he claims he would have testified that he did not intend to shoot the victim, let alone kill her, but the gun discharged as he was attempting to "safety [it] down." *Id.*

The PCRA court, however, concluded McCloskey was entitled to no relief. First, the court determined the claim had no arguable merit.  The court opined:

> In the present case, testimony reflects that [McCloskey] was made aware of his right to testify on his own behalf.  Trial counsel neither interfered with [McCloskey's] freedom to testify nor did he give unreasonable advice that vitiated a knowing and intelligent decision by [McCloskey] on whether to testify.

PCRA Court Opinion, 6/19/2017, at 6.  The PCRA court noted Attorney Miele recalled discussing with McCloskey whether or not he intended to testify at trial, and testified that his general practice would have been to tell McCloskey "on multiple occasions it's [McCloskey's] decision, it's not ours." *Id.* at 7; N.T., 1/10/2017, at 51, 87.  Furthermore, the PCRA court pointed to McCloskey's waiver colloquy, in which he acknowledged to the trial court that

---

[10] It merits emphasis that the PCRA hearings were conducted in early 2017, nearly 11 years after trial.

he was aware of his right to testify in his own defense, and that it was his choice to waive that right. *See* PCRA Court Opinion, 6/19/2017, at 8.

Next, the PCRA court found trial counsel had a reasonable basis for advising McCloskey not to take the stand. The court stated that Attorney Miele's defense strategy was to establish the elements of manslaughter through the cross-examination of the Commonwealth's witnesses. *See id.* at 10-11. Moreover, the PCRA court emphasized counsel's justified concern that if McCloskey took the stand, he could be cross-examined with an inculpatory, taped statement, which he made following his arrest. *See id.* at 11-12. Because McCloskey had rejected a pretrial offer to plead guilty to third degree murder, the trial court found counsel's trial strategy to attempt to demonstrate involuntary manslaughter reasonable. *See id.* at 12.

Lastly, the PCRA court concluded McCloskey suffered no prejudice. Specifically, the court found McCloskey's "testifying did not have a strong likelihood of changing the result of the proceeding, given the taped interviews between [McCloskey] and investigators in which [McCloskey] made inculpatory statements, which would have been included as evidence if [he] took the stand." *Id.* at 13.

After a thorough review of the record, the parties' briefs, and the relevant statutory and case law, we agree McCloskey is entitled to no relief. We recognize McCloskey insists he wanted to testify at trial, but claims Attorney Miele's aggressive behavior and name-calling during their meeting in

his holding cell confused and intimidated him. We note that although Attorney Miele could not specifically recall this meeting with McCloskey, he categorically denied the allegation that he berated and intimidated his client. Counsel testified:

> I know how I react and I know how I deal with things and whatever his witnesses testified that are in your affidavits about how I allegedly reacted in the holding cell is a lie.
>
> * * * *
>
> It makes no sense. [T]hey say I kick things around in the holding cell. There is nothing to kick around back there if you've been back there and they don't allow us in the holding cell. Next, I don't call clients names and I don't swear at them and I don't yell. I don't do those things with clients. So whatever him and your other witnesses want to say, I'm sorry, that's not what happened. …

N.T., 1/10/2017, at 71-72. The PCRA court, faced with this conflicting testimony, was free to find the testimony of McCloskey and his sister not credible. **See Williams**, **supra**.

Furthermore, McCloskey cannot escape the fact that, shortly after this meeting occurred, he participated a colloquy with the trial court in which he acknowledged: (1) he had the opportunity to discuss the decision with his attorney; (2) the decision not to testify was "[p]retty much all of ours[;]"[11] (3) he did not want to testify; and (4) he understood he had both a right to testify and a right to remain silent. **See** N.T., 5/15/2006, 5/17/2006, and 5/18/2006, at 267-269. By indicating the decision not to testify was "all of

---

[11] N.T., 5/15/2006, 5/17/2006, and 5/18/2006, at 268.

ours," McCloskey confirmed he agreed with that decision. ***Id.*** at 268. As noted *supra*, this Court has specifically held: "A defendant will not be afforded relief where he voluntarily waives the right to take the stand during a colloquy with the court, but later claims that he was prompted by counsel to lie or give certain answers." ***Lawson***, ***supra***, 762 A.2d at 756.

Moreover, we do not agree with McCloskey's claim that his exchange with the trial court after the colloquy confirmed his indecision. ***See*** McCloskey's Brief at 8. While McCloskey attempted to explain to the trial court why he requested a continuance, the court stood firm on its ruling that a continuance would not be granted. ***See id.*** at 271-273. McCloskey did not indicate to the court that he wanted to change his decision. Further, McCloskey has not challenged the court's denial of his continuance request on appeal.

We also note that to the extent McCloskey insinuates counsel had no reasonable basis for advising him not to testify at trial, we again disagree. Attorney Miele provided ample reasons for counseling McCloskey to remain silent, including his opinion that McCloskey would "be a horrible witness." N.T., 1/10/2017, at 95. He explained:

> Well, first of all, he gave a statement to the police and that statement we felt was probably equivalent to an admission of third

- 16 -

degree murder.[12]  So you had that issue.  Second of all, McCloskey's position had been throughout that this was an accident and he had taken to attacking everyone who was testifying against him, which is not uncommon at all, attacking also included attacking his children where he called his children liars, he called his children mentally ill and that they were not credible and, again, [Attorney] Spring has notes on that and can give you dates of that on when that occurred.  So overall we feared that because of the statement and because of his attitude and the way Mr. McCloskey approached the case he viewed himself as the victim.  We did not feel he would garner any sympathy from the jury, in fact, I think we were of the opinion that the jury would not like Mr. McCloskey.

*Id.* at 54-55.  Indeed, some of McCloskey's children had given statements to police that Attorney Miele believed "were not helpful to the case."  *Id.* at 88. Attorney Spring specified that "[o]ne of the kids made a statement that [McCloskey] threatened to shoot [the victim] in the head or something[.]" N.T., 2/24/2017, at 84.  She elaborated that based on the children's statements, she "did not expect there would be an accidental shooting, but that what we kind of hoped for was an involuntary" manslaughter conviction. *Id.*  Therefore, based on the numerous reasons outlined above, counsel had a reasonable basis for advising McCloskey not to take the stand.

---

[12] McCloskey's statement to police is not included in the certified record. However, Attorney Miele indicated McCloskey told police the gun "had been cocked" and he was handing it to the victim with the barrel facing her when it fired.  N.T., 1/20/2017, at 79.  However, there was testimony at trial that the gun would not have fired absent someone pulling the trigger.  ***See id.***

Because we agree with the PCRA court's conclusion that McCloskey's ineffectiveness claim has no arguable merit, we affirm the order denying relief.[13]

Order affirmed.

_____

[13] Because we find McCloskey failed to establish the first prong of the ineffectiveness test, we need not determine whether he suffered prejudice. **See Commonwealth v. Keaton**, 45 A.3d 1050, 1061 (Pa. 2012) ("Failure to establish any prong of the test will defeat an ineffectiveness claim."). Nevertheless, we note that both the PCRA court and McCloskey misinterpreted the prejudice prong of the ineffectiveness claim in the present case. Indeed, in **Commonwealth v. Walker**, 110 A.3d 1000 (Pa. Super. 2015), *appeal denied*, 125 A.3d 777 (Pa. 2015), this Court held:

> [T]he appropriate standard for assessing whether a defendant was prejudiced by trial counsel's ineffectiveness regarding the waiver of his right to testify is whether the result of the *waiver proceeding* would have been different absent counsel's ineffectiveness, not whether the outcome of the trial itself would have been more favorable had the defendant taken the stand.

*Id.* at 1005. Accordingly, in order to demonstrate prejudice, McCloskey was required to prove that absent counsel's purported interference, he would not have waived his right to testify. McCloskey's PCRA hearing testimony arguably demonstrates this prong. **See** N.T., 1/10/2017, at 123-124.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/9/2018